**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **KIMBERLY A. BALAS**, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 2:10cv249 |
| | ) | **Electronic Filing** |
| **THE PNC FINANCIAL SERVICES** | ) | |
| **GROUP, INC. AND AFFILIATES,** | ) | |
| **LONG TERM DISABILITY PLAN**, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION**

February 29, 2012

## I.    INTRODUCTION

Plaintiff, Kimberly A. Balas ("Balas" or "Plaintiff"), filed a Complaint against

Defendant, the PNC Financial Services Group, Inc. and Affiliates Long Term Disability Plan

(the "Plan" or "Defendant"), alleging wrongful denial of long term disability ("LTD") benefits

under the Plan pursuant to § 502(a)(1)(B) of the Employee Retirement Income Security Act

("ERISA"), 29 U.S.C. § 1132(a)(1)(B).  The parties have filed cross-motions for summary

judgment, and the matters are now before the Court.


## II.    STATEMENT OF THE CASE

Balas was employed by PNC as a Compliance Specialist from June 26, 1990, through

March 23, 2007.  Plaintiff's Statement of Undisputed Material Facts ("Pl. SUMF") ¶¶ 1 &7;

Defendant's Statement of Undisputed Material Facts ("Def. SUMF") ¶ 1. The job responsibilities

of a PNC Compliance Specialist included coordination and oversight of the requirements of the

compliance program, including monitoring and reporting compliance with regard to the Bank

Secrecy Act. Def. SUMF ¶ 1. As an employee of PNC, Balas was a participant in the Plan. Pl.

SUMF ¶ 3; Def. SUMF ¶ 2.

The Plan provides full-time, salaried employees who are out of work for longer than

ninety (90) days, with LTD benefits. Def. SUMF ¶ 2. The Plan is a self-funded employee

welfare benefit plan, whose benefits are paid out of a separate trust established exclusively for

the benefit of the participants or beneficiaries. Def. SUMF ¶ 3. PNC is the Plan Administrator.

Def. SUMF ¶ 4. PNC and Sedgwick Claims Management Services, Inc. ("Sedgwick") entered

into an Administrative Service Agreement ("Services Agreement") under which PNC delegated

its discretionary authority to construe the terms of the Plan and determine eligibility for LTD

benefits under the Plan. Def. SUMF ¶ 6. Under the Services Agreement, Sedgwick was

conferred the discretion to evaluate and decide claims and any appeals of denied claims. *Id.*

Under the Plan, "Total Disability" and "Totally Disabled" means that "because of Injury

or Sickness":

> The [employee] cannot perform each of the material duties of his
> or her regular occupation; and
>
> After benefits have been paid for 24 months, the [employee]
> cannot perform each of the material duties of any gainful
> occupation for which he or she is reasonably fitted by training,
> education or experience.

Administrative Record ("AR") 9. PNC will pay a monthly LTD benefit after the "Elimination

Period" upon receiving proof that the employee is totally disabled due to sickness or injury and

the employee requires the regular attendance of a physician. AR 9-10. The LTD benefit will be

paid for the period of "Total Disability" if, upon request by PNC, the employee provides proof of

continued "Total Disability" and regular attendance of a physician. AR 10. LTD benefits cease

on the earliest of the date that Total Disability ceases, the date the employee fails to provide

proof of Total Disability, or the date the employee ceases employment with PNC.  AR 10, 14 & 18.

On June 13, 2007, Balas submitted an "Employee Application for Benefits" seeking LTD benefits in which she stated that she was unable to work due to extreme fatigue, mental confusion and forgetfulness. AR 461.  Balas listed her last day of work as March 23, 2007.  *Id.* In support of her application, Balas submitted a "Treating Physicians Statement" completed by Monika Kassyk, M.D. ("Dr. Kassyk").  AR467-469.  Dr. Kassyk listed Balas' primary diagnosis as chronic fatigue syndrome and memory loss.  AR 467.  Though Dr. Kassyk indicated that Balas was unable to stay awake, needed frequent rests, and indicated that the date for release to return to work "depended on final diagnosis," Dr. Kassyk said Balas was released to return to work without restriction. AR 469.

After review of Balas' submissions, Sedgwick denied Balas' request for LTD benefits by letter dated August 30, 2007.  AR 160-163.  Specifically, Sedgwick found:

> [I]nsufficient clinical medical evidence to support your inability to perform each of the material duties of your own occupation as Compliance Specialist throughout the elimination period. Therefore, you are not eligible for LTD benefits . . .

AR  161.  Balas appealed this initial denial by letter dated September 21, 2007, citing her disability due to chronic fatigue syndrome. AR 159.   On October 18, 2007, Sedgwick forwarded Balas' LTD claim file to Network Medical Review ("NMR"), an independent third-party, for reviews of medical experts in the fields of Physical Medicine and Rehabilitation, Internal Medicine, and Pulmonary Diseases. Def. SUMF ¶ 3.  NMR then referred the LTD claim file to Insurance Appeals, Ltd. ("Insurance Appeals"), an accredited review organization. *Id.*

Philip Jordan Marion, M.D., M.S., M.P.H. ("Dr. Marion"), who is board certified in both Physical Medicine and Rehabilitation, and Pain Management, reviewed the disability claim file

for Insurance Appeals.  AR 180-183.  Based on his review, Dr. Marion made the following

findings:

> From a physical medicine and rehabilitation perspective, [Balas] is not disabled from her unrestricted job as of 03/26/07.
>
> The clinical findings consist primarily of her self-reported fatigue complaints.  This is not supported by any specific deficits via physical examination or radiological studies. The patient remains otherwise functionally independent.
>
> The patient's complaints of fatigue are clinically significant; however, they are not supported by any specific underlying objective impairment.

AR 181-182. As his rationale, Dr. Marion offered the following:

> The patient had complaints of fatigue not associated with any specific underlying objective findings via physical examinations or radiological studies.  She remains otherwise functionally independent, ambulatory and not restricted from driving a motor vehicle. From a physical medicine and rehabilitation perspective, there remains no objective impairment to support any specific inability to perform her regular unrestricted job . . .

AR 182.

Clayton T. Cowl, M.D., M.S. ("Dr. Cowl"), who is board certified in Internal Medicine,

Preventive Medicine/Occupational Medicine, and Pulmonary Diseases, reviewed the disability

claim file for Insurance Appeals.  AR 184-186.  Based on his review, Dr. Cowl made the

following findings:

> Based on the medical information provided, [Balas] is not disabled from her unrestricted job as of 03/26/07.

AR 185.  Dr. Cowl offered the following rationale for his opinion:

> There are no objective data provided that substantiates inability to perform clerical sedentary work duties from a respiratory perspective. This is supported by the fact that her pulmonary function testing was normal and her primary care provider also supports the fact that [Balas] would not be considered functionally

4

> impaired on a respiratory bass. Although, she was treated briefly
> for brochitic symptoms and wheezing, these might be more
> functional than infectious or asthmatic in nature. As such, it is the
> opinion of the reviewer that [Balas] does not require
> bronchodilation or inhaled corticosteroids based on the data
> provided.

AR 186.

Michael Gross, M.D. ("Dr. Gross"), who is board certified in Internal Medicine and

Nephrology, also reviewed the disability claim file for Insurance Appeals. AR 187-189. Based

on his review, Dr. Gross made the following findings:

> From an internal medicine standpoint, from the standpoint of
> chronic fatigue syndrome . . . [Balas] would be disabled from her
> regular job as of 03/26/07 to present.
>
> The clinical findings in this case are related to chronic fatigue
> syndrome with inability to stay up for more than 2 or 3 hours
> before requiring a rest period. With this situation, the patient
> cannot do any type of work.

AR 188-189. Dr. Gross offered the following rationale for his opinion:

> This is a patient that carries diagnosis (sic) of chronic fatigue
> syndrome, pulmonary issues, anemia with transfusion, joint pain
> and depression. I am looking at this from an internal medicine
> standpoint. From an internal medicine standpoint, from the
> chronic fatigue syndrome and from the letter in the file dated
> September 20, 2007 from Dr. Monika Kassyk, as well as my
> conversation with Dr. Kassyk, [Balas] would not be able to
> [perform] sedentary (sic) job due to her chronic fatigue syndrome.
> From my discussion with the attending physician, the expected
> appropriate length of disability is indefinite. In this case,
> reevaluation would be appropriate every 3-6 months to reassess the
> situation.

AR 189.

Based upon the review on appeal of Balas' LTD claim file, Sedgwick approved her LTD

benefits on November 6, 2007, stating:

> [T]he medical information contained sufficient clinical evidence to

> substantiate a disabling condition throughout the required waiting period of March 26, 2007 through June 23, 2007 and as such, long term disability benefits are approved from June 24, 2007 through December 31, 2007.

AR 219.

On or about November 21, 2007, Balas informed Sedgwick that the Social Security Administration ("SSA") denied her request for Social Security Disability ("SSD") benefits[1]. Def. SUMF ¶ 45.  Sedgwick then referred Balas to Allsup, Inc. ("Allsup") to assist her in the appeal of the SSA's denial of her claim for SSD. Def. SUMF ¶ 46; Pl. SUMF ¶ 18; AR 32.  After her appeal, Balas was awarded SSD benefits on July 10, 2008, with an eligibility date of September 1, 2007. Pl. SUMF ¶ 19.   The Plan received an offset against the LTD benefits due Balas in the amount of her SSD benefits. Pl. SUMF ¶ 20.

Balas began treating with Dr. Aldino Pierotti ("Dr. Pierotti") at the Fibromyalgia & Fatigue Center in January of 2008. Pl. SUMF ¶ 21. In February of 2008, Sedgwick contacted Balas requesting updated information concerning her medical status.  Def. SUMF ¶ 47.  Balas confirmed that she was still seeing Dr. Kassyk, and informed Sedgwick that her current symptoms included joint stiffness and pain, but she was able to complete light housework, do laundry and prepare meals. *Id.*  In March of 2008, Sedgwick requested that Dr. Kassyk provide Balas' medical records from January 1, 2008, as well as information regarding her current condition, restrictions or limitations, treatment and prognosis. Def. SUMF ¶ 48.  In her response, Dr. Kassyk indicated that Balas was totally disabled, she could not function or stay awake, and the only treatment was "frequent rest."  AR 230.

In March of 2008, Sedgwick also contacted Dr. Pierotti and requested Balas' medical

---

[1]   Pursuant to the Plan, Balas was obligated to apply for SSD benefits after five (5) months of disability. AR 32.

records as well as information regarding her current condition, restrictions and limitations, treatment and prognosis. Def. SUMF ¶ 50.   Dr. Pierotti indicated that Balas' diagnosis included chronic fatigue, hypothyroidism and adrenal insufficiency. AR 228.  He stated that Balas was unable to work because of lack of energy and stamina, but her prognosis to return to work was extremely good. *Id.*  On April 7, 2008, Dr. Pierotti provided the requested medical records which consisted primarily of lab reports and notes from three (3) office visits. Def. SUMF ¶ 52.

Balas first saw Dr. Pierotti on January 10, 2008, with complaints of fatigue, brain fog, poor sleep, stiffness, pain, a sore throat and chronic nasal/sinus problems. Def. SUMF ¶ 53.  Dr. Pierotti's diagnosis was chronic fatigue/immune dysfunction syndrome, and he recommended a treatment of antifungal therapy, back and muscle IV, sleep hygiene and a yeast diet.  *Id.* Dr. Pierotti also provided Balas with a detailed medication regimen in order to treat her issues with sleep, energy, pain and infections. Def. SUMF ¶ 54.  Results of blood tests performed on January 10, 2008, indicated that Balas' immune system was impaired and she tested positive for certain antibodies that could relate to flu-like fatigue. Def. SUMF ¶ 55.

In February 2008, Balas saw Dr. Pierotti and indicated that she was sleeping better, the pain was better, and she had more energy. Def. SUMF ¶ 56.  Balas complained of a sore throat and concentration problems, but her physical examination was within normal limits. *Id.* When Balas saw Dr. Pierotti in March of 2008, she complained of insomnia, pain, lack of energy and poor concentration. Def. SUMF ¶ 57.  Dr. Pierotti noted that Balas was "detoxing," and confirmed that her physical examination was within normal limits. *Id.*  Balas submitted no other records from Dr. Pierotti. Def. SUMF ¶ 58.

Balas continued to see Dr. Kassyk every two (2) to three (3) months, and continued to complain of chronic fatigue and bronchial and/or sinus problems.  Def. SUMF ¶¶ 70 & 71.  Dr.

Kassyk reported that Balas' prognosis for a return to gainful employment was poor. Def. SUMF ¶ 70.  In January, 2009, Balas reported that she was treating with Dr. Lauren Loya at the Fibromyalgia & Fatigue Center. Def. SUMF ¶ 69. Dr. Kassyk provided addition medical records, including lab reports and progress notes, to Sedgwick in February of 2009. Def. SUMF ¶ 71. Balas' lab results were normal except for a low iron reading, and her physical examinations were normal. *Id.*

On or about February 24, 2009, Sedgwick sent Balas' claim file to NMR for a third party review.  Def. SUMF ¶ 72.  NMR sent the file to Elite Physicians, Ltd. ("Elite") where it was reviewed by D. Dennis Payne, M.D. ("Dr. Payne"), a physician board certified in Internal Medicine and Rheumatology.  Def. SUMF ¶ 72; Pl. SUMF ¶ 30.  Dr. Payne discussed Balas' case with Dr. Kassyk on March 5, 2009.  AR 322.  Dr. Kassyk informed Dr. Payne that Balas' diagnosis included chronic fatigue syndrome, with fibromyalgia in association with anxiety, and that she suffered cognitive problems, including confusion, forgetfulness and difficulty with concentration.  *Id.* Dr. Kassyk further indicated that there was no evidence of systemic inflammatory disease and her examinations were unremarkable.  *Id.*

Dr. Payne noted that the medical information submitted did not "detail the onset, pattern and clinical course of her problem." *Id.*  Dr. Payne further noted that "there was no mention of any cardiac, pulmonary, gastrointestinal, or neurological features that would be expected to be producing restrictions and limitations on activities." *Id.*   The medical records were essentially "normal," without mention of joint damage, destruction, weakness, atrophy or synovitis, and minimal mention of tender points.  AR 323.

Based on this medical information, Dr. Payne found no evidence from a rheumatology standpoint that any restrictions or limitations on activities existed in this case.  *Id.*  Dr. Payne's

specific rationale for his findings was as follows:

> Following a careful and thorough review of the medical records in
> this case, including the historical information, workup data,
> examination findings, treatment data, and clinical course
> information, there exists no objective or subjective information
> that would support the presence of any restrictions or limitations
> on activities.  Therefore, from a rheumatology viewpoint, Ms.
> Balas is expected to be capable of unrestrictive work.

AR 323.  Finding that Balas had "failed to provide proof that [she] continue[d] to be totally

disabled as defined by the  . . . PNC LTD plan", Sedgwick informed Balas that her LTD benefits

were terminated effective March 1, 2009[2].  AR 326.

On April 15, 2009, Balas appealed Sedgwick's decision to terminate her LTD benefits.

Def. SUMF ¶ 77; Pl. SUMF ¶ 37.  In support of her appeal, Balas provided a letter from Dr.

Loya dated April 7, 2009.  AR 331-334.  On or about April 30, 2009, Balas provided Sedgwick

with the records of her treatment at the Fibromyalgia & Fatigue Center from January 10, 2008,

through April 7, 2009. Def. SUMF ¶ 80.  On or about May 15, 2009, Sedgwick sent Balas' LTD

file to NMR for review. Def. SUMF ¶ 85.  NMR then sent the file to Insurance Appeals where

the file and all documents submitted in support of the appeal were reviewed by Charles Brock,

M.D. ("Dr. Brock") and Tanya C. Lumpkins, M.D. ("Dr. Lumpkins").  Def. SUMF ¶¶ 85 & 88.

Dr. Brock, who is board certified in both Neurology and Pain Management, reviewed the

medical records submitted and made the following findings:

> From a pain management perspective, the available medical
> records do not support disability from the ability to perform her
> regular unrestricted occupation as of 03/01/09 to 6/22/09.
>
> The available medical records indicate ongoing subjective
> complaints of fatigue and memory loss. The available medical

---

[2]    Though Balas contends that the denial letter did not reference or discuss the opinions of Dr.
Loya, there record indicates that Dr. Loya's records were not provided to Sedgwick until April of
2009, subsequent to Dr. Payne's review and Sedgwick's decision to terminate the LTD benefits.

records do not indicate any focal abnormality neurologically or demonstrate neuromuscular deficit by exam, and as such, does not demonstrate objective evidence of inability to perform her unrestricted occupation.

[T]he available medical records do not document any significant neuromuscular deficits such as abnormal reflexes, muscle weakness, loss of sensation, or radiculopathy. The available medical records do not demonstrate any form Functional Capacity Evaluation with demonstrated validity measures and do not demonstrate an inability to perform the activities of vocation.

AR 418. Similarly, Dr. Lumpkins, who is board certified in Rheumatology and Internal

Medicine, opined that Balas was not disabled, finding:

The medical record fails to demonstrate objectively a rheumatologic diagnosis of sufficient severity to preclude [Balas] from performing the routine duties of a sedentary occupation as a compliance specialist with PNC anti-money laundering position for the dates in question.

It was noted by the attending physician from Fibromyalgia and Fatigue Centers recommending that [Balas] is completely impaired is based on the reported exhaustion and fatigue that [Balas] reports. However, the sleep study was not included in the medical records reviewed to ensure that [Balas] is not suffering from obstructive sleep apnea.  In addition [Balas'] workup to date is unrevealing and does not support in any objective way that [Balas] has significant cognitive impairment. There is no neuropsychological testing that shows that the claimant's cognition is sufficiently impaired, and it is noted that [Balas] has not been restricted from driving.

[Balas] has been diagnosed with chronic fatigue and fibromyalgia. However, there is no objective data of impairment of her physical function that would preclude [Balas] from performing the routine duties of a sedentary occupation requiring her to sit six to eight hours and stand and walk one to two hours each in an eight-hour day.  [Balas] has not been restricted from driving, and it is noted that she has good days and bad days. A sleep study was not included for review and [Balas] has not undergone a neuropsychological evaluation to determine.

[The treating physician's opinion that Balas is disabled] is based on the self reported fatigue and decreased cognitive function that

10

> [Balas] states is present on a regular basis and the overall body
> pain. The attending physicians do not have a specific finding that
> supports the degree of impairment that [Balas] is stating.  It is
> noted that [Balas] has no evidence of sleep apnea and is reported to
> have difficulty with REM sleep.  However, the sleep study was not
> included in the file for review.

AR 424-425.  As her rationale, Dr. Lumpkins offered the following:

> This is a female who carries the diagnoses of chronic fatigue and
> fibromyalgia, who has had a fairly extensive rheumatologic
> workup and imaging study, all of which are unremarkable. It was
> noted that [Balas] has been previously exposed to EBV [Epstein
> Barr Virus] infection but there is no evidence to support an acute
> ongoing infection. [Balas] has self-reported fatigue and exhaustion
> with decreased cognitive function, but there are no neuropsychic
> evaluations to support that [Balas] is impaired and she has not been
> restricted from driving.  She is noted to be independent with her
> activities of daily living and independent with ambulation. The
> medical record fails to support a rheumatologic or internal
> medicine diagnosis of sufficient severity to preclude the claimant
> from performing the routine duties of a sedentary occupation.

AR 425.

On July 14, 2009, Sedgwick informed Balas that it was upholding its denial of her claim

for continued LTD benefits under the Plan.  Def. SUMF ¶ 93; Pl. SUMF ¶ 54.


### III.   LEGAL STANDARD FOR SUMMARY JUDGMENT

Pursuant to FED. R. CIV. P 56(c), summary judgment shall be granted when there are no

genuine issues of material fact in dispute and the movant is entitled to judgment as a matter of

law. To support denial of summary judgment, an issue of fact in dispute must be both genuine

and material, *i.e.*, one upon which a reasonable fact finder could base a verdict for the

non-moving party and one which is essential to establishing the claim. *Anderson v. Liberty

Lobby*, 477 U.S. 242, 248 (1986). When considering a motion for summary judgment, the court

is not permitted to weigh the evidence or to make credibility determinations, but is limited to

deciding whether there are any disputed issues and, if there are, whether they are both genuine and material. *Id*.  The court's consideration of the facts must be in the light most favorable to the party opposing summary judgment and all reasonable inferences from the facts must be drawn in favor of that party as well. *Whiteland Woods, L.P. v. Township of West Whiteland,* 193 F.3d 177, 180 (3d Cir. 1999), *Tigg Corp. v. Dow Corning Corp.*, 822 F.2d 358, 361 (3d Cir. 1987).

When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In the language of the Rule, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial." FED. R. CIV. P 56(e).  Further, the nonmoving party cannot rely on unsupported assertions, conclusory allegations, or mere suspicions in attempting to survive a summary judgment motion. *Williams v. Borough of W. Chester*, 891 F.2d 458, 460 (3d Cir.1989) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). The non-moving party must respond "by pointing to sufficient cognizable evidence to create material issues of fact concerning every element as to which the non-moving party will bear the burden of proof at trial." *Simpson v. Kay Jewelers, Div. Of Sterling, Inc.*, 142 F. 3d 639, 643 n. 3 (3d Cir. 1998), *quoting Fuentes v. Perskie*, 32 F.3d 759, 762 n.1 (3d Cir. 1994).

These rules apply with equal force to cross-motions for summary judgment. *See Lawrence v. City of Phila.*, 527 F.3d 299, 310 (3d Cir. 2008). When confronted with cross-motions for summary judgment, as in this case, the Court considers each motion separately. *See Coolspring Stone Supply, Inc. v. Am. States Life Ins. Co.*, 10 F.3d 144, 150 (3d Cir. 1993) (noting that concessions made for purposes of one party's summary judgment motion do not carry over into the court's separate consideration of opposing party's motion).

**IV.    DISCUSSION**

ERISA provides that a plan participant or beneficiary may bring a suit "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). The statute, however, does not specify a standard of review for an action brought pursuant to § 1132(a)(1)(B). *Mitchell v. Eastman Kodak Co.*, 113 F.3d 433, 437 (3d Cir. 1997). The Supreme Court addressed this issue and opined that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). When the plan affords the administrator with discretionary authority, courts must review the benefit decision for an abuse of discretion. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. at 115. The Court of Appeals for the Third Circuit has referred to this standard of review as "arbitrary and capricious" or "abuse of discretion." Both standards of review are essentially identical and the Court views and will use these terms as interchangeable. *See Howley v. Mellon Fin. Corp.*, 625 F.3d 788, 793 n. 6 (3d Cir. 2010). The parties agree that the standard in this instance is arbitrary and capricious.

Under the arbitrary and capricious standard of review, the Court may overturn a decision of the Plan administrator only if it is "without reason, unsupported by substantial evidence or erroneous as a matter of law." *Abnathya v. Hoffmann-La Roche, Inc.*, 2 F.3d 40, 45 (3d Cir. 1993); *see also Ellis v. Hartford Life and Accident Ins. Co.*, 594 F. Supp. 2d 564, 566 (E.D. Pa. 2009) (noting that a court applying an arbitrary and capricious standard of review is "not free to substitute its judgment for that of the administrator").

Because "benefits determinations arise in many different contexts and circumstances,"

the factors to be considered from one case to the next are "varied and case-specific." *Estate of Schwing v. Lilly Health Plan*, 562 F.3d 522, 526 (3d Cir. 2009). "[A]ny one factor will act as a tiebreaker when the other factors are closely balanced, the degree of closeness necessary depending upon the tiebreaking factor's inherent or case-specific importance." *Metropolitan Life Insurance Co. v. Glenn*, 554 U.S. 105, 117 (2008). The Court will consider all factors relevant to determine whether PNC's decision to deny Balas continuing LTD benefits was arbitrary and capricious.

Balas contends that Sedgwick's decision to deny her continuing LTD benefits was arbitrary and capricious because the denial: (1) was based purely on a lack of objective findings; (2) was in total disregard of the SSA's determination that Balas was totally disabled; (3) failed to provide any explanation for rejecting the opinions of the treating physicians; (4) reversed its prior decision granting Balas LTD benefits even though her condition had not changed; and (5) was based on opinions of reviewing physicians who had not been supplied with complete medical records.

A.    Lack of Objective Findings

Balas' diagnosis by two (2) treating physicians, Dr. Kassyk and Dr. Loya , is that she suffers from chronic fatigue syndrome and fibromyalgia. These physicians further opined that such conditions render Balas unable to perform the requirements of her job with PNC.  The Third Circuit has held that it is arbitrary and capricious to require objective medical evidence in the context of a claim for long-term disability benefits as a result of chronic fatigue syndrome or fibromyalgia. *Mitchell v. Eastman Kodak Co.*, 113 F.3d 433, 442-443 (3d Cir. 1997) ( the requirement of objective medical evidence to establish the etiology of chronic fatigue syndrome, which is defined by the absence of objective medical evidence, is arbitrary and capricious, as it

14

creates an impossible hurdle for claimants.); *Steele v. Boeing Co.*, 225 Fed. Appx. 71, 74-75 (3d Cir. 2007) (finding that it was impermissible to require objective evidence for fibromyalgia, a condition based on subjective complaints of pain and that cannot be proved objectively, and that the effect of such requirement would be to eliminate arbitrarily and capriciously all disability claims based on fibromyalgia.); *see also Kuhn v. Prudential Ins. Co. of Am.*, 551 F. Supp. 2d 413, 427 (E.D. Pa. 2008) ("chronic fatigue syndrome cases are analogous to the situation presented by fibromyalgia cases.").

Defendant argues, however, that the discontinuation of Balas' LTD benefits was not based on a lack of a known etiology for either chronic fatigue syndrome or fibromyalgia, but was based upon Balas' failure to provide objective evidence that her condition limited her functional capabilities such that she was disabled under the Plan. The distinction, therefore, is between Sedgwick requiring objective proof that the Balas has the particular conditions diagnosed, with requiring objective proof that such conditions render her unable to perform the functions of her occupation. In *Lamanna v. Special Agents Mut. Benefits Ass'n*, 546 F. Supp. 2d 261 (W.D. Pa. 2008), this Court stated "[w]hile the amount of fatigue or pain an individual experiences may be entirely subjective, the extent to which those conditions limit her functional capabilities can be objectively measured." *Lamanna v. Special Agents Mut. Benefits Ass'n*, 546 F. Supp. 2d at 296. (citing *Williams v. Aetna Life Ins. Co.*, 509 F.3d 317, 323 (7th Cir. 2007)); see also *Boardman v. Prudential Insurance Co. of America*, 337 F.3d 9, 16, n.5 (1st Cir. 2003) ("While the diagnoses of chronic fatigue syndrome and fibromyalgia may not lend themselves to objective clinical findings, the physical limitations imposed by the symptoms of such illnesses do lend themselves to objective analysis.")

Moreover, courts within the Third Circuit have held that it is not an abuse of discretion to

require objective evidence that a condition, including chronic fatigue syndrome and fibromyalgia, is sufficiently disabling to warrant an award of LTD benefits. *See Wernicki-Stevens v. Reliance Std. Life Ins. Co.*, 641 F. Supp. 2d 418, 426-427 (E.D. Pa. 2009) (finding no evidence that Reliance's discontinuation of Plaintiff's long-term disability benefits was based on a lack of a known etiology for either chronic fatigue syndrome or fibromyalgia, but instead was based upon the results of a Functional Capacity Examination ("FCE") that demonstrated Plaintiff was capable of full time sedentary work); *Gibson v. Hartford Life & Accident Ins. Co.*, 2007 U.S. Dist. LEXIS 47337*39-*40 (E.D. Pa. June 27, 2007) (where Hartford relied, in part, on a Physical Capacities evaluation form in which the consulting physician assessed the frequency with which the plaintiff with fibromyalgia could perform basic physical activities such as grasping with her hands and exercising fine motor skills with her fingers, the decision that the claimant could perform other work was not arbitrary and capricious.); *Magera v. Lincoln Nat'l Life Ins. Co.*, 2009 U.S. Dist. LEXIS 106440 (M.D. Pa. Nov. 16, 2009) (finding it was not arbitrary and capricious for Lincoln to find that the claimants' chronic fatigue and fibromyalgia were no longer so severe that she could be considered totally disabled, as defined by the LTD plan, and was able to return to a position that was almost entirely sedentary.).

Here, Drs. Kassyk and Loya found that Balas was disabled based upon her self-reported fatigue, exhaustion and decreased cognitive function.  In March of 2008, Dr. Pierotti found Balas unable to work due to" lack of energy and stamina," but his prognosis for her return to gainful employment was "extremely good."  There is no evidence, however, that Balas was limited in any of her activities of daily living, she took care of her children, had no limitations of ambulation and she had no driving restrictions.  Moreover, from October 2007, through May 2009, five (5) independent physicians, Dr. Marion, Dr. Cowl, Dr. Payne, Dr. Brock and Dr.

16

Lumpkins, reviewed Balas' medical records and found that she was not disabled as defined under the Plan.  Only one (1) independent physician, Dr. Gross, found Balas disabled based upon her chronic fatigue, but recommended she be re-evaluated "every 3-6 months to reassess the situation."

The Court finds that Sedgwick's reliance on the opinions of Drs. Payne, Brock and Lumpkins and its requirement that Balas provide objective evidence of her inability to perform the material duties of her regular occupation weigh in favor of upholding Sedgwick's determination to terminate her LTD benefits.  To dismiss such reliance, the Court must substitute its judgment for that of the administrator.

B.      Disregard of the Findings of the SSA

Balas contends that Sedgwick's decision to deny her continuing LTD benefits was arbitrary and capricious because such denial disregarded the SSA's determination that Balas was totally disabled.  Pursuant to the Plan, Balas was obligated to apply for SSD benefits after five (5) months of disability. After an initial denial, Balas was awarded SSD benefits on July 10, 2008, with an eligibility date of September 1, 2007.  Balas' receipt of SSD benefits was not addressed in Sedgwick's denial letter of July 14, 2009.

In *Metropolitan Life Insurance Co. v. Glenn*, 554 U.S. 105 (2008), the Supreme Court remarked that a plan administrator's failure to address a claimant's award of social security disability benefits in denying a claim "suggested procedural unreasonableness" under circumstances in which the plan administrator had itself encouraged the claimant to apply for such benefits. *Id.* at 118.  It is well established, however, that an award of SSD benefits does not in itself establish that Sedgwick's decision was arbitrary and capricious. *See Connor v. Sedgwick Claims Mgmt. Servs.*, 796 F. Supp. 2d 568, 584-585 (D.N.J. 2011)(citing *Kosiba v. Merck & Co.*,

2011 U.S. Dist. LEXIS 23247, 52 (D.N.J. Mar. 7, 2011)).  Because the legal principles

controlling the analysis the Social Security Act differ from those governing an ERISA analysis,

the SSA's determination of disability is not binding on an ERISA benefit plan. See *Kosiba v.*

*Merck & Co.*, 2011 U.S. Dist. LEXIS 23247 at 52; *see also Burk v. Broadspire Servs., Inc.*, 342

Fed.Appx. 732, 738 (3d Cir. 2009) (failure to consider award of SSD benefits not abuse of

discretion); *Pokol v. E.I. Du Pont De Nemours & Co.*, 963 F.Supp. 1361, 1380 (D.N.J. 1997)

("[I]t is not inherently contradictory to permit an individual to recover benefits pursuant to the

Social Security Act while being denied benefits pursuant to a private ERISA benefit plan.");

*Krensavage v. Bayer Corp.*, 2006 U.S. Dist. LEXIS 69958, (W.D. Pa. Sept. 27, 2006) ("[C]ourts

have consistently held that ERISA plan administrators are not bound to follow [SSD]

determinations.")).

     An award of SSD benefits, however, "may be considered as a factor in evaluating

whether a plan administrator has acted arbitrarily and capriciously in reviewing a plaintiff's

claim." *Marciniak v. Prudential Fin. Ins. Co. of Am.*, 184 Fed. Appx. 266, 269 (3d Cir. 2006).  If

the plan administrator (1) encourages the applicant to apply for Social Security disability

payments; (2) financially benefits from the applicant's receipt of Social Security; and then (3)

fails to explain why it is taking a position different from the SSA on the question of disability,

the reviewing court should weigh this in favor of a finding that the decision was arbitrary and

capricious. See *Kosiba v. Merck & Co.*, 2011 U.S. Dist. LEXIS 23247 at 54 (citing *Curry v.*

*Eaton Corp.*, 400 Fed. Appx. 51, 68 (6th Cir. Ky. 2010)).

     As stated above, Sedgwick required Balas to apply for SSD benefits as a condition of her

continued receipt of LTD benefits. After an initial denial, Sedgwick referred Balas to Allsup to

assist her in the appeal of the SSA's denial of her claim. The SSA then awarded Balas SSD

benefits on July 10, 2008, with an eligibility date of September 1, 2007.  Consequently, under the terms of the Plan, this award financially benefitted Sedgwick because Balas' LTD benefits were offset by any payment she received from the SSA.

With regard to the third factor, Sedgwick need not follow the decision of the SSA, it must only explain why its decision is contra to that of the SSA.  In this instance, Sedgwick failed to indicate whether it reviewed or considered the SSA's decision in either its denial letters or in the administrative record.  Defendant argues that Sedgwick was unable to review the decision by the SSA  because Balas failed to provide Sedgwick with a copy of the SSA's decision, instead providing Sedgwick with the dates and amounts of the SSD payments awarded to her. Because Balas was required under the Plan to apply for SSD benefits, it was the obligation of the Plan Administrator to request a copy of the decision and make it a part of the administrative record.

In *Haisley v. Sedgwick Claims Mgmt. Servs.*, 776 F. Supp. 2d 33 (W.D. Pa. 2011), this Court found that it was unreasonable for Sedgwick to ignore an award of SSD benefits when it required the plaintiff to apply for such benefits. *Haisley v. Sedgwick Claims Mgmt. Servs.*, 776 F. Supp. 2d at 51. *See also Funk v. Cigna Group Ins.*, 2010 U.S. Dist. LEXIS 90541n.8 (D.N.J. Aug. 31, 2010) (concluding that a plan administrator's failure to reconcile an award of SSD benefits with its determination that the plaintiff was not disabled was a factor which indicated the plan administrator's decision was arbitrary and capricious, especially because the plan administrator assisted the plaintiff in filing for benefits). This Court, therefore, finds that Sedgwick's failure to address the decision of the SSA granting Balas SSD benefits weighs in favor of finding that its decision to terminate her LTD benefits was arbitrary and capricious.

C.     Opinions of Treating Physicians

Balas contends that Sedgwick's decision to deny her continuing LTD benefits was

arbitrary and capricious because it failed to provide any explanation for rejecting the opinions of the treating physicians.  Specifically, Balas argues that "[t]here is a conspicuous lack of credence regarding the opinions of [Balas'] treating physicians [regarding her] total disability."

A plan administrator is not required to give greater weight to the opinions of a claimant's treating physicians than to those of independent medical examiners. In *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 829-830, 832 (2003), the Supreme Court explicitly distinguished ERISA disability cases from Social Security disability claims in which the opinions of treating physicians are given great, if not controlling, weight on matters regarding the severity of a claimant's disability, even though, as the Court acknowledged, in many cases, treating physicians have a better opportunity to know and observe the patient over a period of time as compared to one-time consultants. *Black & Decker Disability Plan v. Nord*, 538 U.S. at 829-830, 832. At the same time, *Black & Decker* did not hold that treating physicians' opinions are never entitled to deference over retained consultants' opinions, only that administrators are not required "automatically to accord special weight to the opinions of a claimant's physician." *Id.* at 834.  In weighing such opinions, an administrator should consider the length of the relationship between claimant and physician and whether any of the physicians in question are specialists in the relevant medical discipline. *Id.* at 832.  On the other hand, plan administrators "may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Id.* at 834.

Here, Balas' treating physicians, Drs. Kassyk and Loya, opined that Balas was disabled based only upon her self-reported fatigue, exhaustion and decreased cognitive function.  Neither doctor listed any restrictions or limitations on her activities. There was no objective evidence that Balas was physically limited with regard to the essential functions of her occupation.  To the

contrary, the evidence of record indicates that Balas was not limited in any of her activities of daily living, she took care of her children, had no limitations of ambulation and had no driving restrictions. Moreover, Balas admitted that as of January 15, 2009, she was fully ambulatory, and she could drive, take care of her two(2) children, clean the house, prepare meals do laundry and sleep nine (9) to ten (10) hours per night. Sedgwick's consulting physicians, therefore, found no objective evidence of an impairment of Balas' physical function that precluded her from employment. The Court finds that Sedgwick's failure to accord the opinions of Drs. Kassyk and Loya regarding Balas total disability controlling weight, does not make its decision to deny continued LTD benefits arbitrary and capricious.

D. <u>Reversal of Prior Decision Granting LTD Benefits</u>

Balas further contends that Sedgwick's decision to deny her continuing LTD benefits was arbitrary and capricious because it reversed its prior decision granting her LTD benefits even though her condition had not changed.  The Third Circuit has held that an administrator's reversal of its decision to award a claimant LTD benefits "without receiving any new medical information to support this change in position is an irregularity that counsels towards finding an abuse of discretion." *Miller v. Am. Airlines, Inc.*, 632 F.3d 837, 848 (3d Cir. Pa. 2011); *see also Post v. Hartford Ins. Co.*, 501 F.3d 154, 164-165 (3d Cir. 2007).  Though the *Miller* court recognized that the initial payment of benefits does not "operate as an estoppel" prohibiting a plan administrator from ever terminating benefits, *Miller v. Am. Airlines, Inc.*, 632 F.3d at 849, it requires that any decision to terminate benefits be based on additional medical evidence not originally reviewed. *See McOsker v. Paul Revere Life Ins. Co.*, 279 F.3d 586, 590 (8th Cir. 2002)(reversal of position supported arbitrary and capricious finding where information used to terminate benefits did "not vary significantly from the [previous] opinions").

21

On November 6, 2007, Sedgwick awarded Balas LTD benefits under the Plan effective from June 24, 2007 through December 31, 2007, and advised her of her continuing obligation under the Plan to provide proof of her continuing total disability.  In February of 2008, Sedgwick contacted Balas requesting updated information concerning her medical status.  Balas confirmed that she was still seeing Dr. Kassyk, and informed Sedgwick that her current symptoms included joint stiffness and pain, but she was able to complete light housework, do laundry and prepare meals. In March of 2008, Sedgwick requested that Dr. Kassyk provide Balas' medical records from January 1, 2008, as well as information regarding her current condition, restrictions or limitations, treatment and prognosis. In her response, Dr. Kassyk indicated that Balas was totally disabled, she could not function or stay awake, and the only treatment was "frequent rest."

Sedgwick was then informed that Balas began treating with Dr. Pierotti at the Fibromyalgia & Fatigue Center in January of 2008.  Dr. Pierotti indicated that Balas' diagnosis included chronic fatigue, hypothyroidism and adrenal insufficiency, but unlike Dr. Kassyk, he indicated that Balas' prognosis to return to work was "extremely good."  Dr. Pierotti recommended a treatment of antifungal therapy, back and muscle IV, sleep hygiene and a yeast diet.   He also provided Balas with a detailed medication regimen in order to treat her issues with sleep, energy, pain and infections. In February 2008, Balas saw Dr. Pierotti and indicated that she was sleeping better, the pain was better, and she had more energy. There is no indication in the record that Balas saw Dr. Pierotti after March of 2008.  Clearly, Dr. Pierotti's records represent new medical information reviewed by Sedgwick subsequent to its granting LTD benefits to Balas.

In January, 2009, Balas reported that she was treating with Dr. Lauren Loya at the Fibromyalgia & Fatigue Center, however, no submissions were provided to Sedgwick from Dr.

22

Loya until April 15, 2009, after Sedgwick terminated her LTD benefits.  In support of her appeal, Balas provided a letter from Dr. Loya dated April 7, 2009.  The letter indicated that Dr. Loya began treating Balas in October of 2008.  On or about April 30, 2009, Balas provided Sedgwick with the records of her treatment at the Fibromyalgia & Fatigue Center from January 10, 2008, through April 7, 2009.  The records indicated that Balas reported some improvement at her December 2008 appointment as she was sleeping better and her pain had decreased.  During her follow-up appointments in February and April 2009, Balas complained of increased pain and poor concentration.

Dr. Lumpkins conducted a teleconference with Dr. Loya on May 19, 2009.  AR 427-428. Dr. Loya indicated that Balas reported that her symptoms had improved 80 to 90% but, it was insufficient for Balas to return to work as she had good days and bad days.  AR 428.  Dr. Loya further indicated that Balas' function supported that she was independent with ambulation, that she required no assistance with her activities of daily living, and she was not restricted from driving.  *Id.*  Dr. Loya opined that Balas was not capable of sedentary work.

The records provided to Sedgwick prior to its determination to uphold its denial of Balas' claim for continued LTD benefits on July 14, 2009, did in fact contain new medical information. Though the treating physicians continued to opine that Balas was unable to work, the records indicated some improvement in her condition, and failed to list any physical limitations or restrictions.  Sedgwick's reversal in this instance does not weigh in favor of an arbitrary and capricious finding.

E.      Opinions Based on Incomplete Medical Records

Finally, Balas contends that Sedgwick's decision to deny her continuing LTD benefits was based upon opinions of reviewing physicians who had not been supplied with complete

medical records.  Specifically, Balas contends that Dr. Payne failed to consider any information from Dr. Loya, and that Dr. Brock did not speak personally with either Dr. Kassyk or Dr. Loya. The Court finds such contentions to be without merit.

Dr. Payne actually discussed Balas' case with Dr. Kassyk on March 5, 2009, and issued his report March 10, 2009.  Dr. Loya did not write her report regarding Balas' condition until April 7, 2009, and the letter was not submitted to Sedgwick until April 15, 2009.  Further, Balas did not provide Sedgwick with the records of her treatment at the Fibromyalgia & Fatigue Center until April 30, 2009.  Therefore, Dr. Payne had no opportunity to review either Dr. Loya's letter or records from the Fibromyalgia & Fatigue Center.  Dr. Brock indicated that he contacted the offices of both Drs. Kassyk and Loya on two (2) occasions, left his contact information, but received no return call from either doctor.  AR 416-417.  Dr. Brock did a comprehensive review of all the medical records submitted, however, and prepared his report based thereon.  There is no evidence that Sedgwick made its decision on anything less than the full record in this case.

Taking into account the above factors, the Court finds only one factor-that being Sedgwick's failure to reconcile an award of SSD benefits with its determination that Balas was not disabled-that weighs in favor of a finding that Sedgwick's determination was arbitrary and capricious. The Court finds Sedgwick's reliance on the opinions of Drs. Payne, Brock and Lumpkins, as well as its requirement that Balas provide objective evidence that her chronic fatigue syndrome and/or fibromyalgia was sufficiently disabling to warrant an award of LTD benefits, weigh in favor of upholding Sedgwick's determination to terminate her LTD benefits. Viewing all of the factors in their totality, the Court concludes Sedgwick's decision to deny benefits was not arbitrary and capricious.

V.    CONCLUSION

Based on the foregoing, the Court finds that Defendant's denial of Balas' continuing long term disability benefits under the Plan was not arbitrary and capricious.  Therefore, Balas' motion for summary judgment shall be denied, and Defendant's motion for summary judgment shall be granted.  An appropriate order follows.


                              s/ David Stewart Cercone
                              David Stewart Cercone
                              United States District Judge

cc:    Wesley T. Long, Esquire
       Victor H. Pribanic, Esquire
       Gina D. Wodarski, Esquire
       Pamela G. Cochenour, Esquire

       (*Via CM/ECF Electronic Mail*)